Good morning, Your Honours. May it please the Court. Two months before its initial public offering, Alibaba was summoned to an unprecedented meeting where high-ranking Chinese officials accused the company of rampant legal violations and threatened massive fines, $8 million, thousands of times a year. Alibaba's executives asked regulators to keep that meeting secret for the avowed purpose of concealing it from investors in its IPO. And when the truth emerged, Alibaba's stock price dropped 13%, causing over $30 billion in investor losses. We're all made up now, right? Pardon? The stock price today, Your Honour? It's all been made up and more now. I'm not aware of what's happened to the stock price over the years since then, but people have bought and sold since then, and under this Court's precedence, it's clear that what matters is what happens to the stock price when the truth is disclosed, at the time of the corrective disclosure. Well, what matters to the shareholders, I think, is did they lose money, and if they held it, would they be in a net loss position today? But continue. Thank you, Your Honour. Alibaba barely defends the District Court's departures from the motion to dismiss Standard. The District Court refused to credit the critical news reports of the massive financial fines that regulators threatened because those reports quoted anonymous sources. But under this Court's decision in Novak, a complaint is allowed to rely on anonymous sources as long as it alleges facts showing that someone in the source's position would have known the facts alleged. And that was done here because the news reports themselves and the complaint both say that the source that reported about these massive financial penalties with which Alibaba was threatened were present at the meeting. The pleading Standard doesn't call upon the Court to evaluate the strength of the evidence. The pleading Standard requires the allegation of specific facts that support a plausible, reasonable, plausible inference of the fraud. But the Court is not in a position to say, well, I think the evidence that supports the specific facts that are alleged is weak, and I wouldn't believe it. It's a question of whether specific facts have been alleged that support a plausible inference of the fraud, right? And I couldn't agree more, Your Honour. And that's precisely why the District Court's opinion here was such a drastic departure from that Standard. She read the news reports and basically ruled, I don't believe them. I think the person quoted is speculating, but that's just not the function of a District Court at this stage in the litigation. Furthermore, the District Court is required in assessing the sufficiency of a complaint to draw reasonable inferences that would support the complaint rather than draw equally reasonable inferences that would discredit it. And again, I couldn't agree more. And that's why it's so striking that in this case, the District Court ignored the hard facts that showed that investors believed that this was incredibly material information. That's not only the fact that when the truth came out, the stock went down 13 percent. It's the fact that Alibaba asked regulators to keep this meeting secret for the precise purpose of concealing it from investors in its IPO. And that's... The District Court discredited the white paper because it was withdrawn after a very short time, drawing the inference that if it was withdrawn, that must mean that it was unauthorized and inaccurate in what it said. I have to say, Your Honour, I like this line of questioning, but again, totally inexplicable. And it's just another giant departure from the standards on a motion to dismiss, and that the District Court did this at every turn. Viewing the complaint and the allegations as the court was required to on a motion to dismiss, it clearly alleges that Alibaba's registration statement was misleading because it omitted this unprecedented meeting and this grave threat of financial sanctions. Alibaba discussed the general regulatory environment in China. It discussed the possibility that regulatory actions may be taken. But nowhere did the registration statement disclose that just two months earlier, Alibaba had had this unprecedented meeting with senior Chinese government officials where regulators accused it of rampant legal violations and threatened specific and very severe financial sanctions. Is there evidence in the record that this meeting was unprecedented? Well, this is at the motion to dismiss stage, Your Honour, and it is specifically pled in the complaint that it's unprecedented. And I can draw your attention in particular to paragraph seven of the complaint, which alleges that the meeting was unprecedented because it included the Director General of the SAIC's Market Regulation Department together with senior executives from seven provincial and local AIC offices. And I mean, just the fact that when this meeting came to light, the stock went down 13 percent, causing $30 billion in investor losses. What better evidence is there that this was unprecedented? This is not a routine regulatory back-and-forth meeting. This was a high-level meeting between senior Chinese government officials, senior Alibaba officials, at which very specific accusations were made about widespread legal violations. And that was concealed from investors. Did the disclosure statements for the IPO reveal that the Chinese government had told Alibaba that it needed to discontinue or curtail its counterfeit business? They did not even say that, Your Honour. What the registration statements stated were very generic descriptions about the fact that these inquiries or investigations were sometimes made. And I can give you an example from page A1044 of the appendix, where Alibaba stated, We have, from time to time, been subject to PRC, Chinese inquiries and investigations, including those related to third-party intellectual property infringement. And then Alibaba states, None of those inquiries and investigations has resulted in significant restrictions on our business operations. However, as we continue to grow, we expect to face increased scrutiny. So that's... Expect what? To face increased scrutiny. That's what Alibaba told investors, that they expect to face increased scrutiny. And how you can say that that disclosure is not misleading, when just two months earlier, there was this unprecedented meeting where they were threatened with crippling massive sanctions for specific findings of legal violations on their marketplaces. This is clearly misleading, Your Honours. It's way beyond anything this Court said in Myers. And it's, you know, completely in line with any number of other cases where courts have made clear that you cannot say one thing in your registration statement, make general references to possibilities or the mere existence of regulatory inquiries, but then hold back the specific facts that would just cast what happened in a completely different light. We have said in the past that disclosure of an item of information is not required simply because it may be relevant or of interest to a reasonable investor. I mean, it doesn't have to be disclosed just because you want to know about it. It certainly doesn't, Your Honour. But this Court's also said in cases like Myers that when you do choose to address a topic, and Alibaba did address the topic of inquiries and investigations from Chinese regulators, if you choose to address a topic, you cannot do it in a misleading fashion. And in light of this unprecedented meeting and these massive threats of financial penalties just two years earlier, it is completely misleading for the only thing you tell investors about this to be that from time to time we've been subject to Chinese inquiries and investigations, but none of them has resulted in any significant restriction on our business operations. And other equally vague and nondescript descriptions of just expectations or possibilities of things that may happen in the regulatory environment. That's misleading, Your Honours. This is a textbook example of a situation where a company chose to address a topic but did it in a completely misleading fashion because they left out the one key detail that did come out. It wiped out $30 billion of market value. The stock price went down 13%. Investors obviously did not think that these vague and generic statements sufficiently conveyed the truth about Alibaba's regulatory investigations. The allegation that they were told at the meeting that they need to curtail, to stop the line of their business, which is counterfeit products? Yes, as reported in the White Paper, that is what they were told. But that too was... And that, even if they weren't told, even if it were not alleged that they would suffer penalties amounting to 1%, a daily penalty of 1% of their volume, the allegation is that they were told they had to discontinue a line of their business that amounted to a very significant percentage of its profits, right? And that's also financial material. It's really a combination of several different facts that when you put them all together, it is just a stark, stark difference between the reality of what happened at the meeting and these utterly generic and uninformative... According to your allegations, this is not simply something that an investor might have found interesting to know. Quite the contrary. This is something that can affect, seriously affect their profits. What was alleged to be the percentage of profits resulting from counterfeit business? I don't recall that there was a quantitative statement about that. There was certainly descriptions in the complaint about the fact that this was so important to them, it was considered its own line of business within the company. So it was clearly a substantial part of their business, and there's some relevant allegations in paragraph 128, and then also on 143, and another one cited in the briefs. But the point is, you know, the best evidence of how important this was to investors is what investors did when they found out. And when this meeting was revealed, analysts reacted with alarm, and investors sold off this stock. They drove it down 13%. And that's just honestly the best evidence there is that investors did not think that what they knew about Alibaba's regulatory exposure from the registration statement was an accurate account. Counsel, thank you. Your time has long expired. Thank you. You're reserved three minutes for rebuttal. Thank you, Your Honor. Good morning. May it please the Court. I would submit the question here is whether Alibaba was required to disclose an informal voluntary meeting called an administrative guidance meeting that was not an investigation, where there were no findings of fact or law, and in response to which it agreed to cooperate, that as of the time of the IPO and through to today, it's not been fined or sanctioned, that it disclosed issues previously relating to this meeting, namely concerns about third parties selling counterfeit goods on its websites and similar, that it disclosed it was subject to new, more stringent laws, that it expected increased scrutiny, that it was going to increase its spending on compliance as a result, and that it could face significant Does the complaint allege that Chinese officials warned Alibaba that it would face penalties of up to 1 percent of its volume for each penalty if it didn't discontinue a very important aspect of its business? Does the complaint allege that? In part, Your Honor. Let me address that. It doesn't allege it? I would suggest that it does not allege it, as you phrased it, Your Honor, and let me explain why. What the complaint alleges is that at this informal meeting, Alibaba was threatened with 1 percent of gross merchandise volume fines per day if it did not effectively do a better job of preventing the sale of counterfeit goods by third parties on its websites. But that's not discontinuing a line of its business, and the white paper which is attached to the complaint doesn't say that. Doesn't the complaint allege that third-party sales of counterfeit merchandise through Alibaba represents a very large part of its business? The complaint does not attempt to quantify, as my colleague said, and there's no evidence in the record quantifying this. Plus, Your Honor. We're not talking about evidence. We're talking about allegations. There are no facts pled in the record to quantify this amount, but I think it's also important to understand what Alibaba is. Alibaba isn't selling counterfeit goods. Alibaba is a platform or a website where third parties can sell. Alibaba makes money from advertising. It doesn't make more or less money because additional counterfeit goods are or are not sold. But I'd like to get back to the Novak issue, if I can, Your Honor, because I think it's a very important issue, and I fully embrace what it is that Judge McMahon did on this issue. What the Court says in Novak is that you can only rely on unidentified sources in two instances, and I know, Judge Pooler and Judge LaValle, you were both on that decision. But first, you can rely on unidentified sources if they are corroborated. Now here, what we have is an Internet blog relying on an unidentified source saying that there was this threat of fines. The logical place to look for corroboration would be in the White Paper itself. The White Paper, and in fact, plaintiffs say that these fines were the critical issue in this case, and yet the White Paper is utterly silent on fines or any actions that the SAIC intended to take. Second, you can only rely on confidential sources if they are identified with sufficient indicia of reliability. Here, you've got a double confidential statement problem, because you've got this blog posted on a website from an unidentified person citing another unidentified source. So you've got a double lack of ability to identify the persons. Now, in response, the plaintiffs have cited a number of cases saying, well, you can rely on news articles, but I would submit to the Court that if you look at those cases, in every single one of those cases, there was corroboration for what was in those news articles. Plus, this isn't in the of the type that would be a typical news article. This is a blog called On the Scene, where people, unidentified people are free to post what they want. So for all of those reasons, I would say that the allegation of fines is not well pled. But even if it was, Your Honor, even if the allegation of fines was well pleaded, remember what else is in the complaint. The complaint alleges, and the White Paper states, Alibaba accepted the guidance that it was given. And the SAIC concludes in the White Paper that the meeting served its purpose. In other words, Alibaba says, okay, we hear you. We're going to work with you. And that was really, again, when you read the excerpts of the White Paper, what they are saying is that, and again, I'll quote from the complaint, that the purpose of the meeting was to supervise Alibaba Group to strengthen its self-regulation, paragraph 230 of the complaint. That is the nature of administrative guidance that we're dealing with. It's an informal process, very different from the kind of regulation we have here, where the government comes to you and says, let's informally talk about this. Because the Chinese economy and the Chinese government obviously works very differently from what we have. So you can compare this to cases like Lionsgate in Richmond from the Southern District, where the courts have repeatedly held you don't even have to disclose, for example, a wells notice from the SEC. And here you've got an informal meeting where there was an agreement to work together. There was never any fine. And there are no well-pleaded allegations of impact. The Court How do you justify the district court's discrediting of the White Paper on the grounds that it was withdrawn after 12 or 13 hours? Well, first of all, I would say to you, Your Honor, that when you read Judge McMahon's opinion, while there is a paragraph in which she notes that, right? Her entire opinion is based on the White Paper. What she says, she expresses some skepticism about it, but she relies on its facts and examines them. And the real fulcrum around which her decision turns is not a rejection of the White Paper. It is not a rejection of the fines allegation. It is the following, that Alibaba made incredibly detailed disclosures, stating it expects increased scrutiny, it's facing tough new laws, it can be subject to declines in revenue or significant fines, and also the fact that the complaint itself alleges that Alibaba accepted the guidance. So I think when you look at the opinion itself, you will see that while there is an afterthought statement that, by the way, it's not very reliable in light of the fact that it was withdrawn, she goes on in the very next paragraph to say even if the White Paper is fully credited, there is no false or misleading statement. You have to, I would submit, read the opinion in its totality, just like you have to look at Alibaba's disclosures in their totality. She thought that the disclosures that were made were sufficient without the July 16th meeting, because everything that came out of that meeting was disclosed anyway. Is that correct? That's correct, Your Honor. She calls the disclosures sober and more detailed than usual. In fact, there were 44 pages of these disclosures that set forth in detail the fact that Alibaba for years had been plagued with allegations of third parties selling counterfeit goods, that it had taken action to attempt to counteract that, that those actions could not necessarily succeed in every instance. It specifically disclosed that in multiple instances, and that it faced stricter regulation going forward that put it at risk of sanctions or harm to the business. So really the only thing missing from the disclosure, as alleged by the plaintiffs, is the fact that there was this meeting that led to everything else they talked about. That's exactly correct. And I would suggest that it is — I think there were threats of gigantic fines. Again, if well pleaded, that there was a threat of fines, but counteracted by the fact that Alibaba accepted the guidance and thus took fines off the table. And as we see, there were no fines as of the time of the IPO and no fines today, and also no significant impact on the business. You know, Judge Pooler, you mentioned the stock price at the beginning of the plaintiff's argument. It's $120 a share today. I know it's extra record. It is. But since you mentioned it, I thought I'd just bring that up. But getting back to the question of impact, there are no well pleaded allegations in the complaint that Alibaba suffered one whit of damage as a result of this July 16 meeting. Plaintiffs say, well, they're on the horns of a dilemma. They either had to pay huge fines or suffer a major downturn in business. There's no allegations that fines were ever assessed or paid. In terms of a downturn in the business, what do we know? Plaintiffs don't allege a single sale that went away. Plaintiffs don't allege a single additional employee that was hired. Plaintiffs don't allege any practices that were changed. And it is undisputed in the record that Alibaba has continued to grow and prosper with its revenues going up 54, 40, and 45 percent a quarter in each of the three following the IPO. If there are no further questions, Your Honors, I will take my seat. Thank you. Thank you. Pry? Yes. Thank you, Your Honor. You have three minutes for rebuttal. Your Honor, counsel's statement of the holding in Novak on anonymous sources couldn't be further off from what that court said. Novak says you can rely on an anonymous source if you either provide corroboration or provide facts establishing that somebody in the source's position would know the information alleged. And that's what was done here because these news reports say that the source was present at the meeting. So that's clearly sufficient under Novak. The district court was required to credit that allegation on a motion to dismiss. And the, you know, these details about what we quoted, a website that had a post from an online platform, first of all, that's not what the complaint alleges. It's not our understanding. But regardless, the complaint says that there were multiple media reports that reported these threats of fines. And I'd invite the court to look at paragraph 75 of the complaint, which quotes an entirely second and independent media source for these threats of financial fines. So that issue is really just a sideshow. Now there was some comments to the effect that all that Alibaba left out was the meeting, but it disclosed everything that was a consequence of the meeting. And that's just not true. What Alibaba disclosed was the fact that this regulatory regime in China existed, the fact that it might face regulatory actions in the future, and then there were some vague references to inquiries, investigations that from time to time Alibaba may have been involved in. Nowhere did Alibaba describe the meeting. Nowhere did it describe the fact that this was an unprecedented meeting with very senior Chinese officials. To hear an opposing counsel at his last point said they may not have discussed the July 16th meeting, but all the substance of that meeting was otherwise disclosed in the fulsome disclosures that Alibaba made. But it wasn't, Your Honor. I mean, I don't know what else I can say. If you look at them, all they have are just general descriptions of the fact that from time to time they get inquiries and investigations from the Chinese government. Nowhere did they say that the Chinese government, these senior officials, had come in and said we've combed through your trading patterns on your online platforms and we found pervasive violations of intellectual property laws. And nowhere did they say anything remotely about these threats of massive fines, $8 million, several thousand times a year. And so to say that this general reference to regulatory inquiries from time to time adequately alerted investors to what actually happened at this unprecedented meeting, you know, it's just not true, Your Honor. You have to look at the registration statement and it's just worlds apart from the actual threats of serious financial penalties they suffered. Now they point out that the fines ultimately didn't come down, but, Your Honors, the complaint describes in detail that these counterfeit sales were a significant portion of Alibaba's revenue. I'd invite the Court in particular to paragraphs 134 and 136 and 143 where there is some quantification of that. There's a specific description about how this will affect Alibaba's advertising revenue going forward if they try to comply with the SAAC's order. And that's not just from the complaint. Analysts at the time this news broke said this is a big problem because it's going to negatively impact Alibaba's revenue, its advertising revenue, in order to comply with the SAAC's order. So they really were on the horns of a dilemma. They faced massive financial penalties or they had to take costly steps to comply that would reduce the revenue and increase their costs. And both of those are described in detail at the complaint and should have been credited on the motion to dismiss stage.  Thank you.